IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA,

*Plaintiff*,

v.                                           Criminal No. ELH-08-381

CALVIN WRIGHT,

*Defendant*.

**MEMORANDUM OPINION**

Defendant Calvin Wright, through counsel, has filed a motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A). ECF 717. The motion is supported by a memorandum (ECF 719) (collectively, the "Motion") and several exhibits.

Wright is currently serving a total sentence of 384 months of imprisonment for drug and firearms offenses. ECF 668.[1] He seeks compassionate release for two reasons: 1) he claims that his sentence is "disproportionately long" as compared to sentences imposed on others for similar conduct, and 2) the COVID-19 pandemic, coupled with defendant's chronic medical conditions, warrants his release. ECF 717 at 1.

The government opposes the Motion. ECF 728. It has also submitted exhibits. ECF 728-1. In the government's view, defendant has not demonstrated an extraordinary and compelling reason for his release. But, even if he has done so, the government urges a reduction of the sentence to 240 months of imprisonment, rather than time served. Wright has replied. ECF 732.

---

[1] Judge Benson Legg, to whom the case was originally assigned, imposed a total sentence of 420 months of imprisonment. ECF 425. The case was reassigned to me due to Judge Legg's retirement. By Memorandum and Order of March 19, 2018 (ECF 667, ECF 668), I reduced defendant's total sentence to 384 months, pursuant to U.S.S.G. Amendment 782.

No hearing is necessary to resolve the Motion.  For the reasons that follow, I shall grant the Motion in part and reduce defendant's sentence to 250 months of imprisonment.

## I.     Procedural and Factual Background

Wright was one of ten defendants in the case.  Only two of the defendants—Wright and Johnnie Butler—proceeded to a jury trial on a Fourth Superseding Indictment (ECF 321).  Judge Benson E. Legg presided at the 13-day trial.  *See* ECF 336, ECF 342, ECF 352, ECF 353, ECF 365, ECF 366, ECF 367, ECF 368, ECF 371, ECF 372, ECF 373.[2]

On January 29, 2010, the jury returned its verdict.  ECF 383.  Of relevance here, Wright was convicted of Count One, conspiracy to distribute one kilogram or more of heroin and conspiracy to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A) and (b)(1)(C); Count Three, charging possession of a firearm on September 11, 2008, in furtherance of the drug conspiracy, in violation of 18 U.S.C. § 924(c)(1)(A)(i); Count Four, charging possession of a firearm by a convicted felon, under 18 U.S.C. § 922(g)(1); and Count Five, charging possession with intent to distribute heroin on September 11, 2008, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C).  *Id.*[3]

The Presentence Report ("PSR", ECF 751)[4] reflected, *inter alia*, that Counts One, Four, and Five were grouped for purposes of calculating the defendant's advisory sentencing guidelines range, but Count Three did not group.  *See id.*, ¶ 16; *see also* U.S.S.G. § 3D1.2(b).  For the grouped

---

[2] The Docket omits reference to Day 3 of the trial.

[3] Butler was charged in Counts One, Two, Three, and Four, but not Count Five. Count Two charged discharge of a firearm, causing the death of Fernando Rodriguez, in furtherance of a drug-trafficking crime. Wright was not charged in Court Two. And, Butler was found not guilty as to Count Two.  ECF 383.

[4] The PSR, which I initially located in Judge Legg's file, was not docketed at the time it was prepared. It was recently submitted for docketing.

offenses, defendant had a base offense level of 36, in accordance with the drug quantity table then in effect. *See* ECF 751, ¶ 18; *see also* § 2D1.1(c)(2) of the U.S. Sentencing Guidelines ("Guidelines" or "U.S.S.G."). In particular, the amount of cocaine involved at least 15 kilograms but less than 50 kilograms and the amount of heroin involved at least 10 kilograms but less than 30 kilograms. ECF 751, ¶ 18. Four levels were added based on defendant's role in the offense, pursuant to U.S.S.G. § 3B1.1(a). *See id.* ¶ 21. Obviously, there were no deductions for acceptance of responsibility under § 3E1.1. *Id.* ¶ 24. Thus, according to the PSR, Wright had an adjusted offense level of 40 for Counts One, Four, and Five. *Id.* ¶ 23. And, as to Count Three, Judge Legg was required to impose a mandatory minimum sentence of five years, consecutive, under 18 U.S.C. § 924(c) and § 2K2.4(b) of the Guidelines. *Id.* ¶ 26; *see also* ECF 481 (Sentencing Transcript).

At sentencing on April 28, 2010 (ECF 419), the defendant was 38 years old. ECF 751 at 1.[5] The government argued for a base offense level of 36, based on a drug quantity in the 10 to 30 kilogram range. ECF 481 at 5. As to the four-level enhancement for role in the offense, the government described Mr. Wright as "sort of the second in command, so to speak." *Id.* at 13. Defense counsel disputed the quantity of drugs foreseeable to Wright. *Id.* at 10-11. The defense argued for a drug quantity of one kilogram (*id.* at 12), and urged a final offense level of 34 for Count One. *Id.* at 12, 31-32.

Judge Legg noted the "extensive nature of the conspiracy," among other things, and found that "10 kilograms or more is the reasonable quantity to plug into the guidelines in the drug quantity table." *Id.* at 15. He recognized that Wright "played a subordinate role to Mr. Butler," and that Butler "was definitely the mastermind and the leader of the overall conspiracy." *Id.* at 16. Nevertheless, Judge Legg determined that a four-level enhancement applied for role in the offense.

---

[5] The defendant was born in 1972. *See* ECF 751 at 1.

ECF 481 at 16-17.  Although Judge Legg did not attribute the murder of Fernando Rodriguez to Wright, he observed that Wright played a role, because he assisted in disposing of the corpse.  *Id.* at 22.  Judge Legg determined that Wright had a final offense level for Count One of 40.  ECF 419 at 17.

The PSR reflected a criminal history category of IV.  ECF 751, ¶ 36.  In particular, the defendant had a prior federal drug conviction, for which he received a 24-month sentence (*id.*, ¶ 29), and one prior offense for driving while impaired.  *Id.* ¶ 31.  But, he committed the underlying offense while on supervised release.  *Id.* ¶ 34.  Therefore, two points were added under U.S.S.G. § 4A1.1(d).  And, he committed the instant offense less than two years after his release on July 8, 2003, for his prior federal offense.  *Id.* ¶ 35.  As a result, another point was added.  *Id.*

Therefore, with a final offense level of 40 and a criminal history category of IV, the Court found that the Guidelines range for Count One (*i.e.*, the grouped offenses) was 360 months to life imprisonment.  ECF 419 at 17; ECF 426; *see also* ECF 751, ¶ 45.  And, as noted, Count Three required a mandatory minimum sentence of 60 months (five years), consecutive.  ECF 751, ¶ 45.

The government sought a sentence for Count One of 530 months, *i.e.*, 45 years.  ECF 481 at 25.  Given that Count Three required a consecutive sentence of five years, the government sought a total sentence of 50 years of imprisonment.  *Id.* at 25, 26.  It provided sound reasons for its recommendation.  In addition to the murder of Rodriguez, the government cited the murder of Sentia Mason, for which charges were pending in State court.  No testimony was presented at the trial in this case as to that murder, but the government argued that Wright again "serv[ed] as cleanup guy helping his boss [*i.e.*, Butler] . . . to get away with a very heinous crime."  *Id.* at 22-23.

4

Judge Legg observed that the defendant came from "a good family, very well educated, responsible . . . ." ECF 481 at 35.  Moreover, he described Wright as "articulate" and "intelligent." *Id.* at 36.  But, he described the drug conspiracy as "systematic," involving firearms and violence. *Id.* at 36, 37.  Nevertheless, he declined to attribute the Mason murder to Wright.  *Id.* at 36.

With full knowledge of all the underlying facts and circumstances, Judge Legg determined that it was appropriate to go to the bottom of the Guidelines range with respect to Count One.  In his view, the government's proposed sentence of 50 years was "too long measured against Mr. Wright's age and his life expectancy . . . ."  Judge Legg reasoned, *id.* at 37: "In my view, the guideline sentence in this case is a reasonable sentence to impose, that serves the goals and recognizes the seriousness of the offense, deterring the defendants, deterring others."  *Id.*

In particular, Judge Legg sentenced Wright to a term of 360 months as to Count One; the mandatory minimum sentence of 60 months, consecutive, as to Count Three; 120 months, concurrent, as to Count Four; and 240 months, concurrent, as to Count Five.  This amounted to a total term of imprisonment of 420 months (35 years).  ECF 425 (Judgment) at 2.

Wright subsequently noted an appeal.  ECF 428.  The Fourth Circuit affirmed on May 18, 2011 (ECF 509) and the mandate issued on June 9, 2011.  ECF 511.

On August 8, 2012, Wright filed a motion to vacate under 28 U.S.C. § 2255.  The next day, on August 9, 2012, the case was reassigned to me, due to the retirement of Judge Legg.  On October 1, 2014, I ordered the appointment of counsel for Mr. Wright.  ECF 594.

Thereafter, on November 26, 2012, Butler, the codefendant, filed a post-conviction motion. *See* ECF 564.  During the course of post-conviction proceedings as to Butler, the government submitted the affidavit of the former lead prosecutor, George Hazel.  ECF 611-1.  By that time, Mr. Hazel had become Judge Hazel, and a colleague of mine on this Court.  Therefore, on January

16, 2015, I recused myself from further consideration of the case and requested an out-of-district assignment.  ECF 612.

On February 3, 2015, Butler's case was transferred to Judge David Faber, who serves in West Virginia.  *See* Docket.  A few days later, Wright's case was also transferred to Judge Faber.

By Order of September 30, 2016, Judge Faber denied Wright's motion to vacate under § 2255.  *See* ECF 641.  Judge Faber subsequently issued a comprehensive, well reasoned Memorandum Opinion and Order on October 13, 2016 (ECF 644), which he subsequently amended (ECF 648), denying Wright's § 2255 motion and denying a certificate of appealability.  ECF 648.  The Fourth Circuit denied a certificate of appealability and dismissed Wright's appeal on February 22, 2017.  ECF 655.  The Mandate issued on April 17, 2017.  ECF 657.

On October 11, 2016, soon after Judge Faber had ruled, Wright, through counsel, filed a motion to reduce sentence, pursuant to 18 U.S.C. § 3582(c)(2) and U.S.S.G. Amendment 782.  *See* ECF 642.  The case was returned to me on March 6, 2018 (Docket) for disposition of the motion for reduction of sentence.  I granted the motion by Memorandum (ECF 667) and Order (ECF 668) of March 9, 2018.  As a result, defendant's total sentence was reduced to 384 months of imprisonment.  Specifically, I reduced Wright's sentence for Count One to 324 months, and left the remainder of his sentence unchanged.

## II.    The Motion

As to the current Motion, defendant has exhausted his remedies.  His request for release, submitted to the Bureau of Prisons ("BOP"), was denied on August 4, 2020.  ECF 719-1.  And, counsel's supplemental request was denied on May 27, 2021.  *Id.*  Defendant has a projected release date of April 21, 2036.  *See Inmate Locator*, BUREAU OF PRISONS, https://www.bop.gov/inmateloc/ (last accessed June 2, 2022).  Calculated from his date of

sentencing, defendant has served about 146 months of his 384-month sentence, or approximately 38%.

In sum, defendant argues that his 384-month sentence is "out of step with current sentencing practices . . ." ECF 719 at 10. He also points out that, with the exception of Butler, all of the codefendants received far shorter sentences than he did. *Id.* at 7-9. And, defendant characterizes his sentence as "unconscionable," and far in excess of the government's plea offer of 180-240 months. *Id.* at 11; *see* ECF 719-2 (the proposed plea agreement). In his view, the sentencing disparity constitutes a compelling reason for a sentence reduction. ECF 719 at 11. Nevertheless, he acknowledges, as he must, that, with the exception of Butler, his codefendants did not go to trial, and thus spared the government the burdens of a trial as well as an appeal. *Id.* at 8.

In addition, the defendant, who is now 50 years of age, points to underlying medical conditions that he claims put him at increased risk for severe illness due to COVID-19. *Id.* at 12. In particular, he asserts that he is obese and suffers from hypertension. *Id.*; ECF 719-4 at 1, 4, 7. His medical records describe his hypertension as "well-controlled on current regimen." ECF 719-4 at 4.

Defendant's Motion indicates that as of May 2020, he weighed 224 pounds and was six feet tall, yielding a Body Mass Index ("BMI") of 31.3. ECF 719 at 13; ECF 719-4 at 13-14. This BMI is considered "obese." *People with Certain Medical Conditions*, *supra*. More recently, as of January 2021, defendant weighed 212 pounds. ECF 719 at 13; ECF 719-4 at 7. The medical note states, *id.*: "Appears Obese." The Motion does not provide a BMI for defendant's January 2021 weight, but to my knowledge, this height and weight equate to a BMI of 28.7. *See Adult BMI Calculator*, CTRS. FOR DISEASE CONTROL AND PREVENTION,

https://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/english_bmi_calculator/bmi_calcul ator.html (last accessed June 3, 2022).  As the Motion acknowledges (ECF 719 at 13), this is considered overweight, but not obese.  *People with Certain medical Conditions*, *supra*.

In addition, the Motion notes that defendant is prediabetic.  *Id*. at 14.  This is supported by defendant's medical records.  ECF 719-4 at 4.

The government opposes the Motion.  ECF 728.  Nevertheless, the government concedes that defendant's "medical conditions confer threshold eligibility . . . ."  *Id.* at 4.  But, it argues that when defendant was infected with COVID-19 in March 2021, "he was in fact asymptomatic."  *Id.* Moreover, the government contends, *inter alia*, that defendant refused the Moderna vaccine on April 28, 2021.  *Id.* at 5; *see* ECF 719-4 at 10.  In its view, this refusal "demonstrates that Petitioner himself has little concern for the risk that COVID-19 presents to his overall health."  ECF 728 at 20.  On the other hand, in a bit of a whipsaw argument, the government maintains that, if defendant were to receive the vaccine, this would mitigate his risk of infection and obviate any need for compassionate release.  *Id.*

In answer to defendant's sentencing disparity argument, the government contends that, if defendant were sentenced today, he would be subject to an enhancement under 21 U.S.C. § 851, because of his prior federal drug offense, even though no such notice was sought in 2008.  ECF 728 at 28.  If so, the government believes the defendant would face a sentence of at least 240 months (15 years for Count One and 5 years, consecutive, for the § 924(c) conviction).  *Id.*  And, in any event, the government argues that, in light of the serious nature of the underlying convictions, the defendant's criminal history, and the fact that he has served less than half of his sentence, the Motion should be denied.  *Id.* at 5.  In the alternative, however, the government

argues that if the Court finds that a sentence reduction is appropriate, it should reduce defendant's sentence to 240 months, rather than time served.  ECF 728 at 28-29.

In reply, the defendant notes that he has since received two doses of the Moderna vaccine. ECF 732 at 5.  In particular, he received one vaccination on August 31, 2021, and a second on September 28, 2021.  *Id.*  Moreover, the defendant reiterates that the government had offered the defendant a plea agreement with a sentencing range of 180-240 months.  *Id.* at 12.  Although Wright rejected the plea offer, he nonetheless argues that the plea offer reflects "a measure of what the government deemed appropriate" at the time.  *Id.*

Notably, defendant also argues that he is not the person he was when he began to serve his sentence more than a decade ago.  *Id.*  In particular, defendant has "taken responsibility for the damage he caused to his community and his family," taken educational and vocational classes while incarcerated, and has received the support of family members and friends.  *Id*.

Indeed, the Motion includes several letters of support from Wright's family members and friends.  *See* ECF 719-5.  It also includes a letter from Wright himself, in which he expresses "how selfish [his] actions were and how it affected [his] family and [his] community."  *Id*. at 1.  Wright explains that, if released, he will reside with his father in Catonsville, Maryland; take classes to obtain a Commercial Driver's License ("CDL") and pursue a career in the trucking industry; and work at the Amazon Fulfillment Center in the meantime.  *Id*. at 2.  Another letter reflects that as of July 2021, Wright has been accepted to a trucking program for convicted felons at the North American Trade School.  *Id*. at 18.  Prison records reflect that Wright has earned his GED while incarcerated.  *See* ECF 719-6 at 3-5.

Wright has accumulated a disciplinary record while incarcerated.  *See id*. at 1-2.  Most recently, in 2019, defendant was sanctioned for fighting with another person.  *Id*. at 1.  In 2014, he

was sanctioned for assaulting another inmate without serious injury.  ECF 719-6 at 1.  In 2012, he

was sanctioned for refusing a work assignment.  And, in 2011 he was sanctioned for phone abuse.

*Id*. at 1-2.

### III.    Standard of Review

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed."

18 U.S.C. § 3582(c); *see United States v. Hargrove*, 30 F.4th 189, 194 (4th Cir. 2022); *United*

*States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson,* 952 F.3d 492,

495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019).  But, "the rule of

finality is subject to a few narrow exceptions."  *Freeman v. United States*, 564 U.S. 522, 526

(2011).  One such exception is when the modification is "expressly permitted by statute."  18

U.S.C.    § 3582(c)(1)(B);    *see    Jackson*,    952    F.3d    at    495.

Commonly termed the "compassionate release" provision, 18 U.S.C. § 3582(c)(1)(A)(i)

provides a statutory vehicle to modify a defendant's sentence if "extraordinary and compelling

reasons warrant such a reduction."  18 U.S.C. § 3582(c)(1)(A)(i); *see Hargrove*, 30 F.4th at 194.

This provision is an exception to the ordinary rule of finality.  *United States v. Jenkins*, 22 F.4th

162, 169 (4th Cir. 2021).

Section 3582 was enacted as part of the Sentencing Reform Act of 1984.  Originally, it

permitted a court to alter a sentence only upon a motion by the Director of the BOP.  *See* Pub. L.

No. 98-473, § 224(a), 98 Stat. 2030 (1984).  Thus, a defendant seeking compassionate release had

to rely on the BOP Director for relief.  *See*, *e.g*., *Orlansky v. FCI Miami Warden*, 754 F. App'x

862, 866-67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1

(E.D. Va. Dec. 18, 2008) (denying  compassionate release motion because § 3582 "vests absolute

discretion" in the BOP).

For many years, the safety valve of § 3582 languished.  The BOP rarely filed motions on an inmate's behalf.  As a result, compassionate release was exceedingly rare.  *See Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

In December 2018, Congress passed the First Step Act of 2018 ("2018 FSA" or "First Step Act"), Pub. L. 115-391, 132 Stat. 5239 (2018); *see United States v. McCoy*, 981 F.3d 271, 275-76 (4th Cir. 2020).  As amended by the 2018 FSA, 18 U.S.C. § 3582(c)(1)(A) now permits a court to reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], *or upon motion of the defendant after the defendant has fully exhausted all administrative rights* to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first.  (Emphasis added).  So, once a defendant has exhausted his administrative remedies, or after 30 days have passed from the date on which the warden has received the defendant's request, he or she may petition a court directly for compassionate release.  *Jenkins*, 22 F.4th at 169; *United States v. Muhammad*, 16 F.4th 126, 129 (4th Cir. 2021); *McCoy*, 981 F.3d at 276.  That option constitutes a sea change in the law.

Under § 3582(c)(1)(A), the court may modify the defendant's sentence if, "after considering the factors set forth in section 3553(a) [of 18 U.S.C.] to the extent that they are applicable," it finds:

(i) extraordinary and compelling reasons warrant such a reduction; or

(ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the

11

safety of any other person or the community, as provided under section 3142(g);

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

See *United States v. Kibble*, 992 F.3d 326, 330 (4th Cir. 2021) (per curiam); *see also Hargrove*, 30 F.4th at 194; *United States v. High*, 997 F.3d 181, 186 (4th Cir. 2021).

Accordingly, in order to be entitled to relief under 18 U.S.C. § 3582(c)(1)(A)(i), the defendant must demonstrate that (1) "extraordinary and compelling reasons" warrant a reduction of his sentence; (2) the factors set forth in 18 U.S.C. § 3553(a) countenance a reduction; and (3) the sentence modification is "consistent" with applicable policy statements issued by the Sentencing Commission. Notably, "Section 3582(c)(1)(A)(i) does not attempt to define the 'extraordinary and compelling reasons' that might merit compassionate release." *McCoy*, 981 F.3d at 276.

Generally, "the district court enjoys broad discretion in conducting a § 3582(c)(1)(A) analysis." *Jenkins*, 22 F.4th at 169. But, the Fourth Circuit has said that, "[w]hen deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)).

In U.S.S.G. § 1B1.13, titled "Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A) Policy Statement," the Sentencing Commission addressed the "extraordinary and compelling reasons" that might merit compassionate release. *See McCoy,* 981 F.3d at 276-77.[6] In

---

[6] The Sentencing Commission acted pursuant to 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction"), as well as 28 U.S.C. § 994(a)(2)(C). *See McCoy,* 981 F.3d at 276.

particular, U.S.S.G. § 1B1.13 provides that, on motion by the Director of the BOP, the court may reduce a sentence where warranted by extraordinary or compelling reasons (§ 1B1.13(1)(A)); the defendant is at least 70 years old and has served at least 30 years in prison (§ 1B1.13(1)(B)); the defendant is not a danger to the safety of any other person or to the community (§ 1B1.13(2)); and the reduction is consistent with the policy statement. U.S.S.G. § 1B1.13(3).

The Application Notes to U.S.S.G. § 1B1.13 are expansive, and indicate that compassionate release may be based on circumstances involving illness, declining health, age, exceptional family circumstances, as well as "other reasons." U.S.S.G. § 1B1.13 App. Notes 1(A)-(D). Application Note 1(D), titled "**Other Reasons**," permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13 App. Note 1(D). This is the "so-called, 'catch-all' category." *McCoy*, 981 F.3d at 276.

However, as the *McCoy* Court recognized, the policy statement in U.S.S.G. § 1B1.13 was issued in 2006 and was last updated in November 2018, *prior* to the enactment of the First Step Act. *McCoy*, 981 F.3d at 276. Of significance here, it is only "directed at BOP requests for sentence reductions." *Id.* (citing U.S.S.G. § 1B1.13). "By its plain terms, in short, § 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)." *McCoy*, 981 F.3d at 282; *see also Jenkins*, 22 F.4th at 169; *United States v. Zullo,* 976 F.3d 228, 230 (2nd Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1100-02 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020). In other words, the policy statement does not apply to this Court.

Indeed, "[a]s of now, there is no Sentencing Commission policy statement 'applicable' to [] defendants' compassionate-release motions, which means that district courts need not conform,

under § 3582(c)(1)(A)'s consistency requirement, to § 1B1.13 in determining whether there exist 'extraordinary and compelling reasons' for a sentence reduction." *McCoy*, 981 F.3d at 283; *see also Hargrove*, 30 F.4th at 194-95.  Consequently, district courts are "'empowered . . . to consider any extraordinary and compelling reason for release that a defendant might raise.'" *McCoy*, 981 F.3d at 284 (quoting *Zullo*, 976 F.3d at 230); *see also Jenkins*, 22 F.4th at 170.

"The factors applicable to the determination of what circumstances can constitute an extraordinary and compelling reason for release from prison are complex and not easily summarized." *Hargrove*, 30 F.4th at 197.  But, "rehabilitation alone cannot serve as a basis for compassionate release." *United States v. Davis*, 2022 WL 127900, at * 1 (4th Cir. Jan. 13, 2022) (per curiam); *see McCoy*, 981 F.3d at 286 n.9; *United States v. Harris*, 2022 WL 636627, at *1 (4th Cir. Mar. 4, 2022) (per curiam); 28 U.S.C. § 994(t).  However, "successful rehabilitation efforts can be considered" in regard to the analysis of extraordinary and compelling reasons. *Harris*, 2022 WL 636627, at *1.

Moreover, the Guidelines "are not directly applicable to defendant-filed motions" under § 3582(c). *Jenkins*, 22 F.4th at 169.  However, "the court may consider these guidelines in defining what should be considered an 'extraordinary and compelling circumstance' warranting a sentence reduction." *Id.* (citing U.S.S.G. § 1B1.13); *see High*, 997 F.3d at 187.  Although there are currently no applicable policy statements for the Sentencing Commission that are applicable to compassionate release, U.S.S.G. § 1B1.13 "remains helpful guidance . . . ." *McCoy*, 981 F.3d at 282 n.7; *see Hargrove*, 30 F.4th at 194.

As the movant, the defendant bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582.  *See*, *e.g.*, *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, 451 F. Supp. 3d 562, 565 (W.D. Va. 2020).  But,

even if the defendant establishes an extraordinary and compelling reason that renders him eligible for a sentence reduction, the court must consider the factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate. *See Dillon v. United States*, 560 U.S. 817, 826-27 (2010); *Hargrove*, 30 F.4th at 195; *High*, 997 F.3d at 186; *see also United States v. Butts*, No. 21-6380, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam) (noting that, even if the district court finds extraordinary and compelling circumstances, it must consider the § 3553(a) factors to the extent applicable in exercising its discretion); *Kibble*, 992 F.3d at 329-30 (noting that district court must consider § 3553(a) factors when considering a motion to reduce sentence under § 3582(c)(1)(A) and district court enjoys broad discretion in conducting this analysis); *United States v. Trotman*, 829 F. App'x 607, 608 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under § 3582(c)(1)(A), the court must consider the sentencing factors under § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020) (district court must give due consideration to the § 3553(a) factors); *United States v. Spriggs*, CCB-10-0364, 2021 WL 1856667, at *3 (D. Md. May 10, 2021) (court must consider the § 3553(a) factors).

As mentioned, the district court is "'empowered . . . to consider *any* extraordinary and compelling reason for release'" raised by a defendant. *McCoy*, 981 F.3d at 284 (citation omitted); *see Jenkins*, 22 F.4th at 169. Nevertheless, compassionate release is a "rare" remedy. *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019); *see Chambliss*, 948 F.3d at 693-94; *United States v. Mangarella*, FDW-06-151, 2020 WL 1291835, at *2-3 (W.D. N.C. Mar. 16, 2020).

To be sure, "[a] district court need not provide an exhaustive explanation analyzing every § 3553(a) factor," nor is it "required to address each of a defendant's arguments when it considers

15

a motion for compassionate release." *Jenkins*, 22 F.4th at 170; *see Chavez-Mena v. United States*,

___ U.S. ___, 138 S. Ct. 1959 (2018) (passim); *High*, 997 F.3d at 187.  But, a district court abuses

its discretion when it "act[s] arbitrarily or irrationally," "fail[s] to consider judicially recognized

factors constraining its exercise of discretion," "relie[s] on erroneous factual or legal premises,"

or "commit[s] an error of law."  *High*, 997 F.3d at 187 (internal quotation marks omitted).

## IV.    COVID-19

The World Health Organization declared COVID-19 a global pandemic on March 11,

2020.  *See Seth v. McDonough*, 461 F. Supp. 3d 242, 247 (D. Md. 2020).[7]  COVID-19 spawned

"a public health crisis more severe than any seen for a hundred years."  *Antietam Battlefield KOA*

*v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020), *aff'd in part, dismissed in part*,

2022 WL 1449180 (4th Cir. May 9, 2022) (per curiam).

On May 11, 2022, the United States "reached more than 1 million COVID-19 deaths,

according to a Reuters tally, crossing a once-unthinkable milestone about two years after the first

cases upended everyday life."  Trevor Hunnicutt & Jeff Mason, *Biden marks one million U.S.*

*COVID deaths after losing political battles*, REUTERS (May 12, 2022),

https://www.reuters.com/world/us/biden-marks-1-million-americans-dead-covid-2022-05-12/.

And, as of June 9, 2022, COVID-19 has infected more than 85.2 million Americans.  *See COVID-*

*19 Dashboard*, THE JOHNS HOPKINS UNIV., https://bit.ly/2WD4XU9 (last accessed June 9, 2022).

The judges of this Court "have written extensively about the pandemic."  *United States v.*

*Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases).

---

[7] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19.  *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://bit.ly/2UMC6uW  (last accessed June 15, 2020).

Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of the pandemic. *Id.*

That said, the Court must reiterate that the COVID-19 pandemic has been described as the worst public health crisis that the world has experienced since 1918. *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration."). Indeed, the pandemic "produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it." *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868, at *1 (E.D. Mich. May 21, 2020), *vacated on other grounds*, 815 F. App'x 978 (6th Cir. 2020). For a significant period of time, life as we have known it came to a halt. For quite some time, businesses and schools were shuttered or operated on a limited basis, in an effort to thwart the spread of the virus, which is highly contagious. *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (Apr. 2, 2020), https://bit.ly/2XoiDDh. The judiciary, too, faced many operational challenges.

People who are stricken with the virus sometimes experience only mild or moderate symptoms. But, the virus can cause severe medical problems as well as death, especially for those in "high-risk categories . . . ." *Antietam Battlefield KOA*, 461 F. Supp. 3d at 223 (citation omitted).

Of relevance here, the Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that may increase the chance of severe illness due to the coronavirus. The risk factors initially identified by the CDC included age (over 65); lung disease; asthma; chronic kidney disease; serious heart disease; obesity; diabetes; liver disease; and a compromised immune system. *See Coronavirus Disease 2019 (COVID-19), People Who Are at Risk for Severe Illness*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 14, 2020), https://bit.ly/2WBcB16. But, the CDC has

repeatedly revised its guidance as to medical conditions that pose a greater risk of severe illness due to COVID-19. In May 2022, it updated its guidance to reflect the most available data. *See People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 2, 2022), https://bit.ly/38S4NfY.

According to the CDC, the factors that increase the risk include cancer; chronic kidney disease; chronic liver disease; chronic lung diseases, including COPD, asthma (moderate to severe), interstitial lung disease, cystic fibrosis, and pulmonary hypertension; dementia or other neurological conditions; diabetes (Type 1 and Type 2); disabilities, such as Down syndrome; heart conditions, such as heart failure, coronary artery disease, cardiomyopathies, and hypertension; HIV; being immunocompromised; liver disease; obesity, where the body mass index ("BMI") is 25 or higher; physical inactivity; pregnancy; sickle cell disease; smoking; solid organ or blood stem cell transplant; stroke or cerebrovascular disease; mental health conditions; substance use disorders; and tuberculosis. *Id.*

The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk. *See Older Adults At Greater Risk of Requiring Hospitalization or Dying if Diagnosed with COVID-19*, CTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 27, 2020), https://bit.ly/3g1USZ1. Furthermore, "[t]he risk of severe illness from COVID-19 increases as the number of underlying medical conditions increases in a person." *People with Certain Medical Conditions*, *supra*.

As to the CDC's risk factors, in the context of a motion for compassionate release, the Fourth Circuit has said that "use of a bright-line rule that accepts only the CDC's highest risk conditions is too restrictive." *Hargrove*, 30 F.4th at 195. In other words, there is no bright-line

rule predicated only on the CDC's identification of certain health conditions in the "highest risk category." *Id.* at 196.

Particularly at the outset of the pandemic, in an effort to stem the spread of the virus, people were urged to practice "social distancing" and to wear masks. *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://bit.ly/3dPA8Ba (last accessed December 9, 2020). However, social distancing is particularly difficult in the penal setting. *Seth*, 2020 WL 2571168, at *2; *Senate Judiciary Hrg. Transcript on Incarceration during COVID-19*, REV.COM (June 2, 2020) (Testimony of BOP Dir. Michael Carvajal at 47:00) ("Prisons by design are not made for social distancing. They are on [sic] the opposite made to contain people in one area."). Indeed, prisoners have little ability to isolate themselves from the threat posed by the coronavirus. *Id.*; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high."). Prisoners usually "share bathrooms, laundry and eating areas," and are often "bunked in the same cell" with several others. Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, N.Y. TIMES (Mar. 16, 2020). And, they are not free to follow their own rules.

To illustrate, prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate or distance themselves from others. *See* Kim Bellware, *Prisoners and Guards Agree About Federal Coronavirus Response: 'We do Not Feel Safe,'* WASH. POST (Aug. 24, 2020) (reporting use of non-reusable masks for months and a lack of transparency around policies for personal protective

equipment and testing). They do not get to decide where, when, or how to eat or sleep. Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to stem their spread. *See Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr. 3, 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 16, 2021) (stating that the "cramped, often unsanitary settings of correctional institutions have been ideal for incubating and transmitting the disease. Social distancing is often not an option."); Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S. 493, 519-20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus. *Seth*, 2020 WL 2571168, at *2. Notably, the BOP implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected. Indeed, as the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3rd Cir. 2020), the BOP has made "extensive and professional efforts to curtail the virus's spread."[8]

---

[8] The *New York Times* reported in June 2020 that cases of COVID-19 "have soared in recent weeks" at jails and prisons across the country. Timothy Williams et al., *Coronavirus cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 18, 2020), https://nyti.ms/37JZgH2; *See Cases in Jails and Prisons*, N.Y. TIMES (Oct. 29, 2020) (On October 29, 2020, the *New York Times* reported that, "[i]n American jails and prisons, more than 252,000

The Department of Justice ("DOJ") recognized the unique risks from COVID-19 experienced by inmates and employees of the BOP. The DOJ adopted the position that an inmate who presents with one of the risk factors identified by the CDC should be considered as having an "extraordinary and compelling reason" warranting a sentence reduction. *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

Former Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, on March 26, 2020, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19. *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020). Then, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281. In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General. *See* Pub. L. No. 116-136, § 12003(b)(2). On April 3, 2020, Attorney General Barr issued another memorandum to Carvajal, finding "the requisite emergency . . . ." *Hallinan*, 2020 WL 3105094, at *9. Notably, the April 3 memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ." *Id.*

---

people have been infected and at least 1,450 inmates and correctional officers have died" from COVID-19.). On November 21, 2020, the *New York Times* reported that "U.S. correctional facilities are experiencing record spikes in coronavirus infections this fall. During the week of Nov. 17, there were 13,657 new coronavirus infections reported across the state and federal prison systems*." America Is Letting the Coronavirus Rage Through Prisons*, N.Y. TIMES (Nov. 21, 2020), https://www.nytimes.com/2020/11/21/opinion/sunday/coronavirus-prisons-jails.html.

On April 16, 2021, the *New York Times* reported that at least 39% of prisoners are known to have been infected in federal facilities. Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 10, 2021). And, according to the article, the actual count is most likely much higher "because of the dearth of testing." *Id.* Nevertheless, with the passage of time, the outbreaks of COVID-19 have declined.

On May 8, 2020, two BOP officials, Andre Matevousian, then Acting Assistant Director of the Correctional Programs Division, and Hugh Hurwitz, then Assistant Director of the Reentry Services Division, issued a memorandum to implement the Attorney General's directives on the increased use of home confinement.  The memorandum provided that the BOP was prioritizing the review of inmates for home confinement, as to inmates who have either served a certain portion of their sentence or who only have a short amount of time remaining on their sentence.

Although there is currently no cure for the virus, medical treatments have continued to improve.  And, significantly, we have seen the rollout of three vaccines for COVID-19 (Pfizer, Moderna, and Johnson & Johnson).[9]  Initially, the vaccines were made available to health care workers, the elderly in nursing homes, and first responders.  But, the criteria for eligibility has since been approved for all persons five years of age and older.  *See* Cheyenne Haslett, *FDA Authorizes COVID-19 Vaccine for Kids 5-11*, ABC News, Oct. 29, 2021, https://abcnews.go.com/Politics/fda-authorizes-covid-19-vaccine-kids-11/story?id=80846188. Approximately 67% of the total U.S. population is fully vaccinated, including 29% of people from ages 5 to 11, 60% of people from ages 12 to 17, 73% of people from ages 18 to 64, and 91% of people age 65 and up.  *See How Vaccinations Are Going in Your County and State*, N.Y. Times, https://www.nytimes.com/interactive/2020/us/covid-19-vaccine-doses.html (last visited June 9, 2022).

---

[9] Questions as to the efficacy of the Johnson & Johnson vaccine were raised as to the Delta and Omicron variants. *See J&J, Sinopharm, Sputnik V COVID-19 shots less effective against Omicron -study*, Reuters (Dec. 17, 2021), https://www.reuters.com/business/healthcare-pharmaceuticals/jj-sinopharm-sputnik-v-shots-weaker-against-omicron-study-shows-2021-12-17/; Apoorva Mandavilli, *J.&J. Vaccine May Be Less Effective Against Delta, Study Suggests*, N.Y. Times (July 20, 2021), https://www.nytimes.com/2021/07/20/health/coronavirus-johnson-vaccine-delta.html.

Moreover, approximately 104.1 million Americans have received a third or "booster" vaccine dose, which the CDC recommends for all persons age 18 and older. *See id*.; *COVID-19 Vaccine Booster Shots*, CTRS. FOR DISEASE CONTROL, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/booster-shot.html (last updated Apr. 15, 2022). And, federal regulators have approved a second booster dose for individuals age 50 and older. *See* Cheyenne Haslett and Eric M. Strauss, *Officials say everyone over 50 can get a 4th COVID shot, but 'especially important' for higher risk people*, ABC NEWS (Mar. 29, 2022), https://abcnews.go.com/Health/4th-covid-shot-authorized-fda-50/story?id=83730999.

Given the vaccine rollout, the BOP published "COVID-19 Vaccine Guidance" on January 4, 2021 (version 7.0). *COVID-19 Vaccine Guidance*, Federal Bureau of Prisons Clinical Guidance (Jan. 4, 2021), https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf. Administration of the COVID-19 vaccine (Pfizer and Moderna) will "align with [recommendations of] the Centers for Disease Control and Prevention." *Id.* at 4. Its plan was for prisoners at heightened risk to receive priority for the vaccine. *Id.* at 6.

The BOP reportedly received its first shipment of vaccines on December 16, 2020. Walter Pavlo, F*ederal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, FORBES (Dec. 21, 2020), https://www.forbes.com/sites/walterpavlo/2020/12/21/ federal-bureau-of-prisons-starts-vaccination-of-staff-inmates-soon-thereafter/?sh=5683b99aa96f. As of June 9, 2022, the BOP had 139,779 federal inmates and approximately 36,000 staff. And, by that date, the BOP had administered 320,257 vaccine doses to staff and inmates. *See* https://www.bop.gov/coronavirus/ (last accessed June 9, 2022).

For a brief time in the Fall of 2021, the country enjoyed a reduction of COVID-19 cases. *See* David Leonhardt, *Covid Cases Keep Falling*, N.Y. TIMES, Oct. 27, 2021,

https://www.nytimes.com/2021/10/26/briefing/covid-cases-falling-delta.html ("The number of new daily COVID-19 cases has plunged since peaking on Sept.1. Almost as encouraging as the magnitude of the decline is its breadth: Cases have been declining in every region."). But, the trend was short-lived, due to the spread of the Delta variant and then the Omicron variant. *See also Eden LLC v. Justice*, ___ F.4th ___, 2022 WL 1790282, at *4 (4th Cir. June 2, 2022) (noting the sequential "deadly surges in COVID-19 cases caused by the Delta and Omicron variants").

The Delta variant was thought to be more virulent than were earlier strains of COVID-19. *See Delta Variant: What We Know About the Science*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html (updated Aug. 6, 2021) (noting that the Delta variant is "more than [two times] as contagious as previous variants"); *see also* Jon Kamp & Brianna Abbott, *Delta Variant Recedes Across the United States*, WALL ST. J., Nov. 1, 2021, https://www.wsj.com/articles/delta-surge-of-covid-19-recedes-leaving-winter-challenge-ahead-11635672600 ("The Delta-fueled wave continues to take a serious toll, but the seven day average in reported deaths has dropped to about 1,400 a day from daily averages above 2,000 in late September, Johns Hopkins data show."); Apoorva Mandavilli, *What to Know About Breakthrough Infections and the Delta Variant*, N.Y. TIMES (Aug. 14, 2021), https://www.nytimes.com/article/covid-breakthrough-delta-variant.html (noting that, as of August 14, 2021, "[i]nfections have spiked to the highest levels in six months").

After the Delta variant, the Omicron variant emerged, both around the world and in the United States. It sparked further cause for concern, because it was highly contagious. *See Omicron Variant: What You Need to Know*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/omicron-variant.html (last updated Dec. 13, 2021). Indeed, Omicron contributed to a substantial and serious spike in COVID-19 cases. *See,*

*e.g.*, Aya Elamroussi, *"Omicron surge is 'unlike anything we've ever seen,' expert says,"* CNN (Dec. 31, 2021), https://www.cnn.com/2021/12/30/health/us-coronavirus-thursday/index.html.

Then, the number of COVID-19 cases again declined. *See, e.g.*, Anabelle Timsit, *U.S. coronavirus cases are dropping. Other countries are breaking records.*, WASH. POST (Feb. 7, 2022), https://www.washingtonpost.com/nation/2022/02/07/covid-omicron-variant-live-updates/#link-ZMG6VYX45VH5RAD3JX3IN3JF3Y. And, the country began to return to normalcy.

Nevertheless, we are again experiencing a serious surge in COVID-19 cases. *See, e.g.*, Anne Barnard, *Covid Cases Are Rising Again. How Cautious Should We Be?*, N.Y. TIMES (Apr. 7, 2022), https://www.nytimes.com/2022/04/07/nyregion/covid-cases-are-rising-again-how-cautious-should-we-be.html. Indeed, a new subvariant of the virus is "spreading rapidly and will probably become the dominant form of the virus in the United States in the next few weeks." *See* Isabella Grullón Paz, *A new subvariant is spreading rapidly in the United States*, N.Y. TIMES (May 9, 2022), https://www.nytimes.com/live/2022/05/04/world/covid-19-mandates-vaccine-cases. And, the "Biden administration is preparing for the possibility that 100 million Americans will be infected with the coronavirus this fall and winter . . . ." Amelia Nirenberg, *A Coming Fall Surge?*, N.Y. TIMES (May 9, 2022), https://www.nytimes.com/2022/05/09/briefing/100-million-coronavirus-covid-us.html.

As of June 9, 2022, the BOP reported that 165 federal inmates, out of a total population of 139,779, and 300 BOP staff, out of some 36,000 staff members, currently tested positive for COVID-19. Moreover, 50,906 inmates and 12,810 staff have recovered from the COVID-19 virus. In addition, 296 inmates and seven staff members have died from the virus. The BOP has completed 128,717 COVID-19 tests. *See* https://www.bop.gov/coronavirus/, *supra*.

With respect to FMC Devens, where the defendant is imprisoned, the BOP reported that as of June 9, 2022, out of a total of 942 inmates, zero inmates and one staff have tested positive, 13 inmates have died of COVID-19,[10] and 374 inmates and 201 staff have recovered at the facility. In addition, 463 staff members and 964 inmates have been inoculated with the vaccine at the Devens complex.   *See*   https://www.bop.gov/coronavirus/, Federal Bureau of Prisons, https://www.bop.gov/locations/institutions/dev/ (last visited June 9, 2022).

## V.   Discussion

As discussed, the Motion argues that extraordinary and compelling circumstances, warranting compassionate release, exist by reason of defendant's medical conditions, and his asserted sentencing disparity.  ECF 719 at 1, 7-22.  Per the Motion, defendant's hypertension, his status as obese or overweight, and his prediabetes all place him at increased risk for COVID-19. *Id*. at 11-18.  Wright seeks a reduction of his sentence, ideally to time served.  *Id*. at 1.  The government opposes the Motion; in the alternative, it suggests that a sentence reduction to 240 months would be appropriate.  ECF 728.[11]

The CDC has noted that "high blood pressure (hypertension)" potentially "can make you more likely to get very sick from COVID-19."  *People with Certain Medical Conditions*, *supra*.  I am mindful that the CDC's criteria are not binding in the analysis of whether a health condition qualifies as an extraordinary or compelling basis for compassionate release.  *See Hargrove*, 2022 WL 905436, at *4-5.  Nevertheless, the CDC provides useful information.  And, courts have found

---

[10] The status of FMC Devens as a medical facility may account for this relatively high number of deaths.

[11] The government maintains in the Opposition that *McCoy* was wrongly decided, and that the Court's consideration of the Motion is constrained by the Sentencing Commission's policy statement. *See* ECF 728 at 11 n.5. Of course, the Court will follow Fourth Circuit law as laid out in *McCoy*, which is to the contrary.

that, in light of the COVID-19 pandemic, hypertension, combined with other conditions, qualifies

as a compelling reason for compassionate release. *See, e.g.*, *United States v. Thomas*, 471 F. Supp.

3d 745, 749 (W.D. Va. 2020) ("[C]ourts...across the country have released individuals suffering

from hypertension, but only when these individuals also suffered from other underlying medical

conditions."); *United States v. Hilow*, No. 15-170-JD, 2020 WL 2851086, at *4 (D. N.H. June 2,

2020) (involving asthma, migraines, hypertension, high cholesterol, prediabetes, and borderline

obesity); *United States v. Gutman*, RDB-19-0069, 2020 WL 24674345, at *2 (D. Md. May 13,

2020) (finding defendant's age of 56 years, multiple sclerosis, and hypertension satisfied

extraordinary and compelling reason); *United States v. Coles*, No. 00-cr-20051, 2020 WL

1976296, at *7 (C.D. Ill. Apr. 24, 2020) (granting compassionate release to defendant with

hypertension, prediabetes, prostate issues, bladder issues, and a dental infection); *United States v.

Zukerman*, 451 F. Supp. 3d 329, 336 (S.D.N.Y. 2020) (concluding that defendant's diabetes,

hypertension, obesity, and age satisfied extraordinary and compelling reason).  Moreover, some

courts have found extraordinary and compelling circumstances when hypertension is the sole

condition. *See, e.g.*, *United States v. Salvagno*, 456 F. Supp. 3d 420, 423, 427-29 (N.D.N.Y. 2020);

*United States v. Sawicz*, 453 F. Supp. 3d 601, 604-05 (E.D.N.Y. 2020).

Defendant appears to fluctuate between "obese" and "overweight."  Numerous courts have

found that, in light of the COVID-19 pandemic, obesity, particularly when combined with other

chronic medical conditions, can qualify as a compelling reason for compassionate release.  *See,

e.g.*, *United States v. Smith*, 538 F. Supp. 3d 990, 995 (E.D. Cal. 2021) ("Many courts have also

found that people who have a body mass index within the ranges defined as 'overweight' or 'obese'

are at greater risk of severe COVID-19."); *United States v. Staten*, PJM-01-284-4, 2020 WL

4904270, at *2 (D. Md. Aug. 18, 2020) (finding an "extraordinary and compelling reason" for

27

compassionate release based on a BMI of 38); *United States v. Williams*, PWG-19-134, 2020 WL 3073320 (D. Md. June 10, 2020) (finding obese defendant with a BMI of 32.5 qualified for compassionate release in light of COVID-19); *United States v. Quintero*, 08-CR-6007L, 2020 WL 2175171, at *1, 458 F.Supp.3d 130 (W.D.N.Y. May 6, 2020) (finding defendant's diabetes, compromised immune system, obesity, and hypertension satisfied an extraordinary and compelling reason); *United States v. Dawson*, No. 18-40085, 2020 WL 1812270, at *7 (D. Kan. Apr. 9, 2020) (granting compassionate release based on a defendant's obesity).

Finally, as to prediabetes, a number of courts have found that prediabetes alone is not sufficient to constitute an extraordinary and compelling reason in the context of COVID-19. *See, e.g.*, *United States v. Manning*, 5 F.4th 803, 807 (7th Cir. 2021) (noting prediabetes is not recognized by the CDC as increasing risk); *United States v. Evans*, CCB-18-234, 2021 WL 3725421, at *1 (D. Md. Aug. 23, 2021) (same); *United States v. Freeman*, No. 13-CR-50071, 2021 WL 843456, at *1 (N.D. Ill. Mar. 5, 2021) (same); *United States v. Mungarro*, No. 07-20076, 2020 WL 6557972, at *2-3 (E.D. Mich. Nov. 9, 2020) (noting roughly one in three Americans are prediabetic); *United States v. Hall*, JKB-04-323, 2020 WL 4582712, at *2 (D. Md. Aug. 10, 2020). On the other hand, "[c]ourts have found that the combination of prediabetes and obesity have been sufficient to warrant release." *United States v. Readus*, No. 16-20827-1, 2020 WL 2572280, at *3.

Consistent with the above cases, I am satisfied that Wright's various medical conditions, when considered together, constitute extraordinary and compelling circumstances under the compassionate release statute. This is particularly so when also considering defendant's sentencing disparity, as discussed below. *See McCoy*, 981 F.3d at 285-86 (emphasizing that the district court's finding of extraordinary and compelling circumstances must be the "product of

individualized assessments of each defendant's sentence," and may consider "the sheer and unusual length" of the defendant's sentence).

The Opposition makes much of the fact that, at the time the Motion was filed, defendant had refused the COVID-19 vaccine.  *See* ECF 728 at 21-22.  But, as of the Reply, Wright has received the vaccine.  *See* ECF 732 at 5.  Moreover, the Court does not accept the government's argument that, were defendant to be vaccinated, this would substantially weaken his case for compassionate release.  *See* ECF 728 at 20-21.

The COVID-19 vaccines help to reduce the health risks posed by the coronavirus.  But, as the recent surge indicates, the fact of vaccination does not assure protection from COVID-19, nor defeat eligibility for compassionate release.  *See United States v. Palmer*, PWG-13-623, 2021 WL 3212586, at *3 (D. Md. July 29, 2021) ("It is impossible to predict the impact of the vaccines on future strains of the virus, just as it is impossible to predict the impact of COVID-19 on [defendant's] specifical medical issues."); *Spriggs*, 2021 WL 1856667, at *3 (inmate having received vaccine "does not negate that his underlying health conditions make him eligible for compassionate release.").

Indeed, the media is replete with reports of breakthrough infections of COVID-19 among vaccinated individuals.  And, albeit in rare cases, they can result in death.  *See Rates of COVID-19 Cases and Death by Vaccination Status*, CTRS FOR DISEASE CONTROL AND PREVENTION, https://covid.cdc.gov/covid-data-tracker/#rates-by-vaccine-status (last updated Apr. 4, 2022).  Recent developments seem to suggest that the pandemic may be with us indefinitely.

Several judges of this court have concluded that an inmate is eligible for compassionate release, notwithstanding vaccinated status.  *See, e.g.*, *United States v. Jenkins*, DKC-12-0043, 2021 WL 5140198, at **4-5 (D. Md. Nov. 4, 2021) (granting compassionate release to a defendant based

on his obesity and chronic kidney disease, in spite of the fact that he was fully vaccinated against COVID-19); *United States v. Garcia*, CCB-11-569, 2021 WL 4846937, at *2 (D. Md. Oct. 15, 2021) (finding that a vaccinated defendant's diabetes and hypertension constituted extraordinary and compelling circumstances); *United States v. Hussain*, PWG-13-661, 2021 WL 3367822, at *4 (D. Md. Aug. 3, 2021) (explaining that a fully vaccinated defendant with a history of smoking as well as a number of underlying conditions, including moderate asthma and hypertension, presented an extraordinary and compelling reason for his release).

Therefore, I conclude that defendant's medical conditions satisfy the first hurdle in the analysis; they render him eligible for compassionate release.

Even when a court finds extraordinary and compelling reasons for compassionate release, however, relief is warranted under 18 U.S.C. § 3582(c)(1)(A) only if appropriate in light of the factors set forth in 18 U.S.C. § 3553(a). *See High*, 997 F.3d at 186.  These include: (1) the nature of the offense and the defendant's characteristics; (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (3) the kinds of sentences available and the applicable Guidelines range; (4) any pertinent Commission policy statements; (5) the need to avoid unwarranted sentence disparities; and (6) the need to provide restitution to victims.  *Id*.

There is no doubt that Wright's crime was extremely grave.  He played a significant role in an extensive drug conspiracy, involving large quantities of illegal substances.  And, Judge Legg observed at sentencing that Wright played a role in the murder of Fernando Rodriguez, by assisting in disposing of the corpse.  ECF 419 at 22.  Furthermore, defendant has a serious criminal history. This includes a prior federal drug conviction that resulted in a 24-month sentence.  ECF 751, ¶ 36. Therefore, a lengthy sentence of incarceration was, and remains, appropriate.

At the same time, the Court must acknowledge the length of Wright's sentence, even after its prior reduction to 384 months.  Defendant's projected release is in 2036.

On a somewhat superficial level, the length of defendant's sentence is striking when compared to those of his codefendants.  *See* ECF 719 at 4.  Aside from Butler—whom Judge Legg referred to as the leader of the conspiracy, and who received a sentence of life imprisonment— Wright's sentence is substantially longer than all of his other codefendants.  Adrian Aulton (ECF 401) and Daron Ashe (ECF 440) received sentences of 130 months of imprisonment; Antoine Boston received 100 months (ECF 464); Akeem Yarberough received 50 months (ECF 470); Shawn Moore received 24 months (ECF 231); Geraldmaine Wilkerson received 18 months (ECF 551); and Walter Horton received a sentence of time served.  ECF 540.  And, aside from Butler and Wright, all other defendants have been released.

But, the length of a sentence does capture the whole story.  A defendant's offense level and criminal history affect the Guidelines calculation, and these factors vary with each defendant.  Codefendants may also play varying roles in an offense.  Moreover, Wright rejected the plea agreement and opted for trial, thereby foreclosing deductions to his offense level for acceptance of responsibility, which would have been earned by his codefendants.  So, there are sound reasons to explain why Wright received a sentence that exceeded the sentences of his codefendants.

That said, Wright's original sentence was fifteen years longer than the sentence of twenty years contemplated by the government in its plea offer to defendant.  *See* ECF 719-2, ¶ 11.  Even after defendant's sentence was reduced under Amendment 782, defendant's sentence is twelve years longer than the plea offer.

To be sure, in extending the plea offer, the government undoubtedly considered that, if defendant were to plead guilty, he would spare the government, the Court, the jurors, and the

witnesses the challenges and burdens of the trial process.  And, the government is entitled to reward a defendant who accepts responsibility for criminal conduct and/or who spares the system the burden of a trial.  Defendant elected to reject the plea offer; he put the government, the Court, jurors, and witnesses through a trial and later through an appeal.  On these facts, it was entirely reasonable for the government to decide that the terms of the plea offer no longer applied to defendant.

On the other hand, the Court is aware of the view that when the government seeks a sentence that exceeds its plea offer, it appears to constitute punishment of the defendant for the exercise of his right to proceed to trial.  *See*, *e.g.*, *United States v. Sessoms*, ___ F. Supp. 3d ___, 2021 WL 4592522, at *3 (E.D.N.Y. Oct. 6, 2021) (finding extraordinary and compelling circumstances, in part, because defendant received harsher sentences than other defendants who did not go to trial); *United States v. Cabrera*, 531 F. Supp. 3d 863, 868 (S.D.N.Y. 2021) (Rakoff, J.) (in granting compassionate release motion, criticizing "the corrosive effects of the trial penalty," and "refus[ing] to punish a defendant for his choice to exercise his constitutional rights"); *United States v. Cano*, No. 95-00481-CR, 2020 WL 7415833, at *6 (S.D. Fla. 2020) (granting compassionate release in part based on disparity in sentences between defendant and codefendant who pleaded guilty).  As to this case, I do not share that view.  The facts warranted the lengthy sentence.

Nevertheless, Wright's sentence of 384 months is arguably in excess of more recent sentences in this District for equally serious crimes.  As Judge Blake has observed, the average federal sentence for murder has declined in recent years.  *See United States v. Bryant*, 95-202-CCB-3, 2020 WL 2085471, at *5 n.8 (D. Md. Apr. 30, 2020) ("According to statistics released by the United States Sentencing Commission for fiscal year 2018, the national average sentence for

murder was 291 months, and the Fourth Circuit average was 327 months.") (citing *United States v. Redd*, 444 F. Supp. 3d 717, 728 (E.D. Va. 2020)); United States Sentencing Commission, Statistical Information Packet, Fiscal Year 2018, Fourth Circuit, available at (https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2018/4c18.pdf), *aff'd*, *McCoy*, 981 F.3d 271.  Indeed, the trend has continued since the time *Bryant* was decided: data from the United States Sentencing Commission reflects that in fiscal year 2020, the national average sentence for murder was 255 months, and the Fourth Circuit average was 271 months. See United States Sentencing Commission, Statistical Information Packet, Fiscal Year 2020, Fourth Circuit, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2020/4c20.pdf.  And, of course, although Judge Legg noted that Wright played a role in Rodriguez's murder, defendant was not convicted of murder.

In considering a motion under the First Step Act, courts often look to a defendant's post-sentencing conduct, because it "provides the most up-to-date picture of [his] 'history and characteristics.'"  *Pepper v. United States*, 562 U.S. 476, 492 (2011) (citing 18 U.S.C. § 3553(a)(1)).  Nevertheless, although rehabilitation efforts can be considered, rehabilitation alone cannot serve as a basis for compassionate release.  *Davis*, 2022 WL 127900, at *1; *see Lancaster*, 997 F.3d at 175 ("And in considering the § 3553(a) factors, the court can take into account a defendant's conduct after his initial sentencing."); *United States v. McDonald*, 986 F.3d 402, 410-12 (4th Cir. 2021) (noting that on a motion to reduce sentence under the First Step Act, district court must consider defendant's post-sentencing conduct); *United States v. Randall*, 837 Fed. App'x 1008, 1009 (4th Cir. 2021) ("[A] district court must provide an individualized explanation for denying a sentence reduction motion under the First Step Act when the defendant presents

evidence of his post-sentencing rehabilitation."); *United States v. Rudisill*, 834 Fed. App'x 827, 829 (4th Cir. 2021) (finding district judge abused his discretion in denying motion under the First Step Act without addressing defendant's post-sentencing conduct).

While defendant has been incarcerated, he has engaged in substantial rehabilitative efforts, including obtaining his GED and taking other vocational and educational courses, including a CDL prep class.  ECF 719 at 20; ECF 719-6 at 3-4.  In defendant's letter to the Court, he has expressed a recognition of the "selfish" nature of his crimes, and their negative effects on his family and community.  ECF 719-6 at 1.  He has indicated a firm commitment, upon his release, to support his family, contribute as a productive member of society, and never return to prison.  ECF 719-5 at 1-3.  Friends and family members, including defendant's children and his father, have written in support of Wright, and described the way he has changed for the better while incarcerated.  *Id.* at 4-46.  Moreover, although Wright's disciplinary record in prison is not flawless, he has accumulated only four offenses.  The last one occurred in 2019.  Until then, defendant had not had an infraction since 2014.  ECF 719-6 at 1-2.

In addition, I am mindful that defendant's incarceration in the midst of a global pandemic has "sufficiently increased the severity of the sentence beyond what was originally anticipated such that the purposes of sentencing are fully met even with the proposed reduction*." United States v. Green*, TDC-10-761, 2020 WL 2992855, at *4 (D. Md. June 4, 2020); *see also United States v. Park*, No. 16-cr-00473, 2020 WL 1970603, at *5, 456 F. Supp. 3d 557 (S.D.N.Y. Apr. 24, 2020) (noting that a sentence "that was sufficient but no greater than necessary" may now, in light of COVID-19, become "one immeasurably greater than necessary").

Given the gravity of Wright's offenses, as well as his criminal history, immediate release is wholly unwarranted.  However, the length of defendant's sentence; his rehabilitative efforts; his

disciplinary record; and his medical conditions, combine to create a basis for a reduction of defendant's sentence. In my view, a reduction from 384 months to a total of 250 months is reasonable in light of the circumstances of this case.

Notably, a total sentence of 250 months is close to the government's alternative proposal of 240 months, set forth in its Opposition. *See* ECF 728 at 28-29. And, it exceeds slightly the top end of the plea offer that the defendant chose to reject. *See* ECF 719-1, ¶ 11.

The First Step Act "does not constrain the Court to decide between immediate release or no reduction at all, and instead leaves the Court discretion in its evaluation of the appropriate sentence once it finds 'extraordinary and compelling reasons.'" *United States v. Braxton*, JKB-09-478, 2020 WL 4748536, at *5 (D. Md. Aug. 17, 2020). Thus, the Court's decision need not be confined either to immediate release or leaving the existing sentence intact. The statutory text of the First Step Act allows courts to "reduce the term of imprisonment" upon a finding of "extraordinary and compelling reasons." 18 U.S.C. § 3582(c)(1)(A).

Numerous district courts in both this Circuit and others have granted sentence reductions without immediate release. *See, e.g.*, *United States v. Johnson*, RDB-07-0153, 2020 WL 6063733, at *5 (D. Md. Oct. 14, 2020) (reducing sentence from 360 months to 300 months); *Braxton*, 2020 WL 4748536, at *5 (reducing sentence from 246 months to 168 months); *United States v. Marks*, 455 F. Supp. 3d 17, 37-38 (W.D.N.Y. 2020) (reducing sentence from 40 years to 20 years); *United States v. Arey*, Crim. No. 5:05-00029, 461 F.Supp.3d 343, 2020 WL 2464796 (W.D. Va. May 13, 2020) (reducing sentence but denying immediate release); *United States v. Day*, 474 F. Supp. 3d 790 (E.D. Va. 2020) (same); see *also United States v. Zullo*, 976 F.3d 228, 327 (2d Cir. 2020) ("It bears remembering that compassionate release is a misnomer. 18 U.S.C. § 3582(c)(1)(A) in fact

speaks of sentence reductions. A district court could, for instance, reduce but not eliminate a defendant's prison sentence . . .").

Accordingly, I find that a reduction in Wright's sentence is warranted.  In particular, I will reduce the sentence for Count One from 324 months to 190 months; leave the 120-month sentence for Count Four unchanged; and reduce the sentence for Count Five from 240 months to 190 months.  When combined with the mandatory minimum consecutive sentence of 60 months for Count Three, this results in a total sentence of 250 months.  Such a sentence is "sufficient, but not greater than necessary" to comply with the purposes of sentencing. 18 U.S.C. § 3553(a).

## VI.    Conclusion

Accordingly, I shall grant the Motion in part and reduce defendant's sentence to 250 months of imprisonment, as described.

An Order follows, consistent with this Memorandum Opinion.

Date: June 10, 2022                                                    /s/
                                                          Ellen L.  Hollander
                                                          United States District Judge